IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 1, 2020

## IN RE DYLLON M. ET AL.

**Appeal from the Juvenile Court for Knox County**
**No. 166087    Timothy E. Irwin, Judge**

_____

### No. E2020-00477-COA-R3-PT

_____

In this termination of parental rights case, Appellant/Mother appeals the trial court's termination of her parental rights to the minor children on the grounds of: (1) substantial noncompliance with the requirements of the permanency plan, Tenn. Code Ann. § 36-1-113(g)(2); (2) mental incompetence, Tenn. Code Ann. § 36-1-113(g)(8); and (3) failure to manifest an ability and willingness to parent the children, Tenn. Code Ann. § 36-1-113(g)(14).  Appellant also appeals the trial court's finding that termination of her parental rights is in the children's best interests.  We reverse the trial court's termination of Mother's parental rights on the ground of substantial noncompliance with the requirements of the permanency plan.  We affirm the trial court's termination of Mother's parental rights on all remaining grounds and on its finding that termination of Mother's parental rights is in the children's best interests.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Reversed in Part, Affirmed in Part, and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ANDY D. BENNETT, J., joined.

Mary L. Ward, Knoxville, Tennessee, for the appellant, Cherish M.[1]

Herbert H. Slatery, III, Attorney General and Reporter, and Kristen Kyle-Castelli, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names to protect their identities.

# OPINION

## I. Background

Appellant Cherish M. ("Mother") is the biological parent of Dyllon M. (d/o/b May 2007) and Aaliya M. (d/o/b June 2008) (together, the "Children").[2] Appellee Tennessee Department of Children's Services ("DCS") became involved with this family around September 8, 2017, when it removed the Children from Father's care after receiving allegations of severe child abuse. On September 8, 2017, DCS filed, in the Knox County Juvenile Court ("trial court"), a petition for: (1) adjudication of dependency and neglect; (2) an *ex parte* protective custody order; and (3) temporary legal custody. At the time, the Children were living in Tennessee with Father, his girlfriend, and the Children's half-siblings. Mother was living (and currently lives) in Colorado. Prior to this case, Mother had not seen the Children since 2011, when Father moved the Children from Colorado to Tennessee. The Children have been living in foster care with their half-siblings since their removal from Father's custody.

In the fall of 2017, DCS initiated an Interstate Compact on the Placement of Children ("ICPC") home study to determine whether to place the Children in Mother's care. On November 29, 2017, the ICPC was denied, in pertinent part, due to: (1) Mother's extensive history with the Colorado Department of Human Services ("Colorado DHS"), including 61 hotline referrals, and four "founded" child abuse allegations, with Mother as the perpetrator; (2) criminal charges for child abuse for which Mother received a deferred sentence; (3) Mother's failure to understand that it is not simply about "doing what [Colorado] DHS asked," but rather changing her parenting habits to prevent Colorado DHS' initial involvement; (4) Mother's intellectual disability that has an effect on her comprehension abilities and also makes her vulnerable to people taking advantage of her, as demonstrated with Alexia and her previous domestic abuse relationship;[3] (5) Mother's inability to maintain her own finances (a third-party agency manages her finances so she can keep her housing, and Mother also receives services through other providers to assist with her intellectual disability); (6) the concern that placing more children with Mother would add stress to the home, and that Mother would be unable to care for the additional children; (7) Mother's lack of personal transportation; and (8) Mother's failure to maintain a relationship with the Children after they left Colorado. For the foregoing reasons, Colorado DHS explained that it could not approve the placement at the time, but encouraged DCS to "help the [C]hildren foster a relationship with [Mother] through telephone calls and perhaps [Mother] coming to Tennessee for visits."

---

[2] Howard V. ("Father") is the Children's biological father. The trial court previously terminated his parental rights to both Children, and he is not a party to this proceeding.

[3] Alexia and Haley are Mother's two children that lived with her in Colorado. During the pendency of this case, Haley turned 18 years old and moved out of Mother's apartment. Alexia is a minor and continues to reside with Mother.

After the ICPC denial, DCS developed several family permanency plans to address the concerns in the ICPC study. Mother participated via telephone in the creation of the plans, and she was given copies of the plans to review with her providers in Colorado. In a September 20, 2018 permanency plan, Mother was given several responsibilities, including to: (1) regularly visit with the Children; (2) maintain a bonded relationship with the Children; (3) interact and engage with the Children with age appropriate activities and meals during visits; (4) not promise the Children things that are not within the scope of what she can provide; (5) act as a parent and not allow her oldest child to take on the parenting role; (6) participate in family therapy to learn how to communicate with her children in an appropriate manner and apply the skills learned during visits; (7) learn how to establish age appropriate rules, guidelines, and consequences for all of her children; (8) demonstrate appropriate discipline of children and learn how to manage the Children's behaviors with non-physical forms of discipline; (9) be aware of her children's medical, mental health, and/or educational needs as well as how to care for their needs; (10) understand the importance of keeping her children's doctor's appointments and of her children's education; (11) demonstrate skills learned regarding use of non-physical forms of discipline and not have any other referrals or "founded" investigations of physical abuse of children; (12) attend a parenting assessment and parenting education classes specifically focused on children with self-harming behaviors, aggression, lying, ADHD, manipulation, and other mental health issues; (13) ensure that no one living in Mother's home is abusive to Mother or any children; (14) accept, acknowledge, and verbalize responsibility for her actions, including verbalizing the effect of the abuse on the victim; (15) complete a risk assessment and provide full disclosure of her abuse history; (16) attend individual therapy to learn what triggers her anger and what coping skills she can develop to control it; (17) fully disclose her mental health history, including her anxiety, depression, and bipolar feelings to her therapist, and inform the therapist of her four "founded" cases of physical child abuse with Colorado DHS as well as her domestic violence history and anger issues; (18) provide documentation from counseling showing safety issues have been addressed and remediated, including a statement that the home is safe for the Children; (19) successfully complete a psychological evaluation and follow recommendations regarding specific services to assist Mother in learning to care for the Children as well as an assessment of her ability to benefit from services; (20) take all medication as prescribed and submit to random pill counts; (21) obtain and maintain appropriate housing and furnishings for herself and all of her children; (22) obtain and maintain a legal source of income to provide for all of her children's basic needs, which can include SSI, SSA, other benefits or legal employment; (23) pay $80 per month in child support; (24) maintain contact with DCS; and (25) understand when authorities should be contacted for assistance.

On March 20, 2018 and January 14, 2019, the trial court heard DCS' petition for dependency and neglect. At the hearing, the trial court heard evidence that Aaliya and Isabella, the Children's half-sister from Father, sustained physical injuries while in Father's care, which led to their hospitalizations. The trial court also heard evidence of improper discipline and abuse of all four children. By order of January 14, 2019, the trial court found

that both Aaliyah and Isabella had been severely abused while in Father's care and adjudicated the girls dependent and neglected.[4] Dyllon and the Children's other half-sister, Madilyn, were also adjudicated dependent and neglected.[5]

It is unclear from the record, but sometime after a court hearing in 2018, Mother visited with the Children for the first time since their move to Tennessee. While DCS allotted several hours for Mother's visit, it lasted only 45 minutes as Mother became frustrated with the situation and left. Thereafter, Mother traveled to visit the Children only two more times, in March 2019 and in June 2019.

On May 23, 2019, DCS filed a petition to terminate Mother's parental rights on the grounds of: (1) abandonment by failure to visit; (2) substantial noncompliance with the permanency plan; (3) mental incompetence; and (4) failure to manifest an ability and willingness to assume custody. DCS also alleged that termination of Mother's parental rights was in the Children's best interests. A guardian ad litem ("GAL") was appointed for the Children, and counsel was appointed to represent Mother.

The trial court heard DCS' petition on March 11, 2020. The trial court heard from the following witnesses: (1) Dr. Abraham Brietstein, Ph.D., a clinical psychologist who performed a psychological evaluation of Mother; (2) Ms. Terrie Delp, DCS supervisor and case manager for the Children; (3) Ms. Terra McGill, the therapist providing in-home treatment for the Children and their foster parents; (4) Monica Gilbert, a supervisor who provided therapeutic visitation between Mother and the Children; and (5) Mother. DCS entered into evidence: (1) the petition to terminate Mother's parental rights; (2) some documents from the underlying dependency and neglect case; (3) documents regarding the ICPC study; (4) two of the five permanency plans created in this case; (5) Dr. Brietstein's evaluation of Mother; and (6) photographs of the Children.

By order of April 24, 2020, the trial court found clear and convincing evidence to terminate Mother's parental rights on the grounds of: (1) substantial noncompliance with the permanency plan; (2) mental incompetence; and (3) failure to manifest an ability and willingness to assume custody.[6] The trial court also found, by clear and convincing evidence, that termination of Mother's parental rights is in the Children's best interests. Mother appeals.

---

[4] The trial court entered this order on May 8, 2019, *nunc pro tunc* to January 14, 2019.

[5] Tennessee Code Annotated section 37-1-102(b)(13)(F) provides that a dependent and neglected child includes a child "[w]ho is . . . under such improper guardianship or control as to injure or endanger the morals or health of such child or others." Tenn. Code Ann. § 37-1-102(b)(13)(F). Given the abuse and neglect Aaliya and Isabella suffered, it is clear that Dyllon and Madilyn were also under improper guardianship so as to endanger their health. Tenn. Code Ann. § 37-1-102(b)(13)(F); *see also* **In re S.J.**, 387 S.W.3d 576, 589 (Tenn. Ct. App. 2012).

[6] The trial court did not find clear and convincing evidence to support the ground of abandonment by failure to visit.

## II. Issues

Mother raises four issues for review, which we restate as follows:

1. Whether the trial court erred when it denied Mother's motion for continuance.

2. Whether the trial court erred when it found clear and convincing evidence to terminate Mother's parental rights under the substantial noncompliance with the permanency plan ground.

3. Whether the trial court erred when it found clear and convincing evidence to terminate Mother's parental rights under the mental incompetence ground.

4. Whether the trial court erred when it found, by clear and convincing evidence, that termination of Mother's parental rights was in the Children's best interests.

## III. Standard of Review

The Tennessee Supreme Court has previously explained that:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522-23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute, which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL

1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove: (1) the existence of one of the statutory grounds; and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination of parental rights cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523-24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)). The Tennessee Supreme Court has explained that:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524.

Furthermore, if the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). Therefore, this Court "gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837). Here, the trial court made a specific finding that

Mother was not a credible witness, and we defer to the trial court concerning Mother's testimony.

## IV. Analysis

As a preliminary matter, we note that Mother's brief contains procedural defects that should be addressed. Under Tennessee Rule of Appellate Procedure 27(a)(7)(A), an appellant's brief shall contain:

> (7) An argument, which may be preceded by a summary of argument, setting forth:
>
> (A) the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, **with citations to the authorities and appropriate references to the record** (which may be quoted verbatim) relied on;

Tenn. R. App. P. 27(a)(7)(A) (emphasis added).

Three sections of Mother's "Argument" portion of her brief fail to comply with this rule. Mother's argument concerning the trial court's denial of her motion for continuance fails to cite legal authority and/or appropriate references to the record as required by Rule 27(a)(7)(A) of the Tennessee Rules of Appellate Procedure. *See also* Tenn. R. Ct. App. 6(b) ("No complaint of or reliance upon action by the trial court will be considered on appeal unless the argument contains a specific reference to the page or pages of the record where such action is recorded. No assertion of fact will be considered on appeal unless the argument contains a reference to the page or pages of the record where evidence of such fact is recorded."). Two of Mother's arguments concerning the grounds on which the trial court terminated her parental rights also fail to comply with the rule. Concerning the mental incompetence ground, Mother fails to cite any legal authority. As discussed, *infra*, the mental incompetence ground requires DCS to prove two elements, and Mother discusses neither in her argument. In the section of her brief concerning the ground of substantial noncompliance with the permanency plan, Mother provides scattered citations to the record, but once again provides no authority to support her arguments. Importantly, Mother fails to explain what her responsibilities were under the permanency plans and/or how she complied with same.

The sections of Mother's brief that discuss the motion for continuance and the grounds of mental incompetence and substantial noncompliance with the permanency plan neither develop her arguments nor cite authority to support her positions. Tenn. R. App. P. 27(a)(7)(A); ***Branum v. Akins***, 978 S.W.2d 554, 557 n. 2 (Tenn. Ct. App. 1998) (internal citations omitted) ("Where a party makes no legal argument and cites no authority in

- 7 -

support of a position, such issue is deemed waived and will not be considered on appeal."). "This [C]ourt has repeatedly held that a party's failure to cite authority for its arguments or to argue the issues in the body of its brief constitute a waiver on appeal." *Forbess v. Forbess*, 370 S.W.3d 347, 355 (Tenn. Ct. App. 2011) (citing *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006) (failure "to cite to any authority or to construct an argument regarding [a] position on appeal" constitutes a waiver of the issue); *Bean v. Bean*, 40 S.W.3d 52, 55-56 (Tenn. Ct. App. 2000) ("Courts have routinely held that the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue.")); *see also* ***Tellico Village Property Owners Ass'n, Inc. v. Health Solutions, LLC***, No. E2012-00101-COA-R3-CV, 2013 WL 362815, at \*3 (Tenn. Ct. App. Jan. 30, 2013) (*no perm. app. filed*). As this Court has previously stated, we are

> ". . . not charged with the responsibility of scouring the appellate record for any reversible error the trial court may have committed." [***Owen v. Long Tire***, LLC, No. W2011-01227-COA-R3-CV, 2011 WL 6777014, at \*4 (Tenn. Ct. App. Dec. 22, 2011)]. "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." ***Sneed v. Bd. of Prof'l Responsibility of Sup. Ct.***, 301 S.W.3d 603, 615 (Tenn. 2010).

> \*\*\*

> "[T]he Supreme Court has held that it will not find this Court in error for not considering a case on its merits where the plaintiff did not comply with the rules of this Court." ***Bean***, 40 S.W.3d at 54-55 (citing ***Crowe v. Birmingham & N.W. Ry. Co.***, [1 S.W.2d 781] (1928)). "[A]ppellate courts may properly decline to consider issues that have not been raised and briefed in accordance with the applicable rules." ***Waters v. Farr***, 291 S.W.3d 873, 919 (Tenn. 2009). "We have previously held that a litigant's appeal should be dismissed where his brief does not comply with the applicable rules, or where there is a complete failure to cite to the record." ***Commercial Bank, Inc. v. Summers***, No. E2010-02170-COA-R3-CV, 2011 WL 2673112, at \*2 (Tenn. Ct. App. July 11, 2011).

***Clayton v. Herron***, No. M2014-01497-COA-R3-CV, 2015 WL 757240, at \*2-3, (Tenn. Ct. App. Feb. 20, 2015) (*no perm. app. filed*). Here, Mother has "merely construct[ed] . . . skeletal argument[s]" concerning the motion to continue and the mental incompetence and substantial noncompliance with the permanency plan grounds. *Sneed*, 301 S.W.3d at 615. As a result, ordinarily, we would conclude she waived these issues, and we would decline to address them on appeal.

Despite the deficiencies in Mother's brief, we conclude we are obligated to review these issues. The Tennessee Supreme Court has advised that "the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26. It only follows that we must also review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent's brief complies with our rules of appellate procedure. Given the fundamental liberty interests at stake, this is the only logical conclusion. *Id.* at 522 (citing *Troxel*, 530 U.S. at 65; *Stanley*, 405 U.S. at 651; *In re Angela E.*, 303 S.W.3d at 250; *In re Adoption of Female Child*, 896 S.W.2d at 547-48; *Hawk*, 855 S.W.2d at 578-79). Despite Mother's deficient briefing, we turn to address the substantive issues.

## A. Motion to Continue

Mother filed a motion for continuance the morning of the termination hearing. While neither the motion nor the trial court's order denying same appear in our record, we can glean Mother's arguments and the trial court's reason for denying the motion from the transcript of the termination hearing. According to her counsel, Mother requested a continuance because she was unable to attend the termination hearing as she had a truancy hearing for Alexia in Colorado the same day. Mother's attorney also explained that she was new to the case, and Mother had yet to meet with her new attorney in person so as to adequately prepare for trial. The trial court also heard arguments from counsel for DCS and the Children's GAL. DCS pressed to move the trial forward, citing the fact that the final hearing was previously continued, at Mother's request, due to Mother's alleged car accident that resulted in her hospitalization. Though DCS requested information concerning the car accident and Mother's hospitalization, Mother never provided any documentation. DCS was concerned Mother was using a truancy hearing as an excuse to again continue the trial. The Children's GAL echoed DCS' argument and added that trial should proceed because the Children required stability. In denying Mother's motion, the trial court stated that it would "not yield to Truancy Court in Colorado." Further, the trial court explained that, because of the Children's tenure in DCS custody, it wanted to move forward with the trial to give the Children some necessary stability.

"[W]hether to grant a continuance is a matter that lies within the sound discretion of the trial court, and its decision will not be disturbed on appeal absent a showing that the [trial] court abused its discretion and that the party seeking a continuance has been prejudiced." *Mires v. Clay*, 3 S.W.3d 463, 467 (Tenn. Ct. App. 1999) (citing *Blake v. Plus Mark, Inc.*, 952 S.W.2d 413 (Tenn. 1997)). We cannot say the trial court abused its discretion when it denied Mother's motion for continuance. At the time of the termination hearing, the Children had been in foster care for over three years, and the trial had already been continued once due to Mother's alleged car accident. It is reasonable that the trial

court would proceed with the trial to bring finality to the case and to provide the Children with some permanency. We also cannot say that Mother was prejudiced by the trial court's denial of her motion to continue. Two hours after the trial began, Mother joined the proceeding via telephone. The trial court explained the previous testimony, and Mother was able to fully participate in the proceeding, even testifying on her own behalf. Also, Mother's counsel was present throughout the proceeding. In light of the foregoing, we cannot conclude that the trial court abused its discretion or that Mother was prejudiced. Therefore, we affirm the trial court's denial of Mother's motion for continuance.

## B. Grounds for Termination

### 1. Substantial Noncompliance with the Permanency Plan

The trial court found, by clear and convincing evidence, that Mother's parental rights should be terminated on the ground of substantial noncompliance with the requirements of the permanency plans. Tennessee Code Annotated Section 36-1-113(g)(2) provides that a parent's rights may be terminated when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan."

"[T]he permanency plans are not simply a series of hoops for the biological parent to jump through in order to have custody of the children returned." *In re C.S., Jr., et al.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at *10 (Tenn. Ct. App. Sept. 14, 2006). Rather,

> the requirements of the permanency plan are intended to address the problems that led to removal; they are meant to place the parent in a position to provide the children with a safe, stable home and consistent appropriate care. This requires the parent to put in real effort to complete the requirements of the plan in a meaningful way in order to place herself in a position to take responsibility for the children.

*Id.* As discussed by this Court in *In re A.J.R.*, No. E2006-01140-COA-R3-PT, 2006 WL 3421284, at *4 (Tenn. Ct. App. Nov. 28, 2006):

> To prevail in a termination case on a claim of substantial noncompliance with a permanency plan, DCS must prove: (1) the terms of the plan, *Dep't of Children's Services v. D.W.J.*, No. E2004-02586-COA-R3-PT, 2005 WL 1528367 (Tenn. Ct. App. E.S., June 29, 2005); (2) that the plan requirements were reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003); and (3) that the parent's noncompliance was substantial in light

- 10 -

of the degree of noncompliance and the importance of the particular requirement that has not been met. *Valentine*, 79 S.W.3d at 548-49; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at \*12 (Tenn. Ct.App. M.S., June 3, 2003); *Dep't of Children's Services v. T.M.B.K.*, 197 S.W.3d 282, 293 (Tenn. Ct. App. 2006).

*In re A.J.R.*, 2006 WL 3421284, at \*4. The Tennessee Supreme Court has explained that

> [s]ubstantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." Black's Law Dictionary 1428 (6th ed. 1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement.

*In re Valentine*, 79 S.W.3d at 548.

We do not reach the substantive question of whether Mother was substantially noncompliant with the permanency plans. While the trial court made findings and terminated Mother's parental rights under this ground, we conclude that the proof in the record is insufficient to support the trial court's findings and conclusions. According to DCS and the trial court, DCS created five permanency plans during the pendency of this case. In its termination petition, DCS did not specify under which plan or plans Mother was substantially noncompliant. Rather, it alleged that Mother "has not substantially complied with the responsibilities and requirements set out for her in the permanency plans." Therefore, it appears that DCS alleges Mother was substantially noncompliant with all five permanency plans.

When DCS relies on substantial noncompliance with a permanency plan for termination, "it is essential that the plan be admitted into evidence." *In re A.J.R.*, 2006 WL 3421284, at \*4. Even if a plan is later revised, "the original plan must still be included in evidence, in addition to the revised plan, if DCS is relying on noncompliance with the original plan as a ground for termination." *In re T.N.L.W.*, No. E2006-01623-COA-R3-PT, 2007 WL 906751, at \*5 (Tenn. Ct. App. Mar. 26, 2007) (citing *In re A.J.R.*, 2006 WL 3421284, at \*4). This is so both the trial court and this Court may understand "exactly what responsibilities and requirements were placed upon the parent by the permanency plan[s], and when they were to be completed." *In re T.N.L.W.*, 2007 WL 906751, at \*5. Without each permanency plan in the record, the lower court and this Court are unable to determine whether a parent complied with the responsibilities in the permanency plans. Further, without the permanency plans in the record, we cannot determine whether Mother "had notice of exactly what the . . . permanency plan[s] required of her." *In re A.J.R.*,

2006 WL 3421284, at *4.  This review is essential to ensuring each parent is afforded due process.  *See In re Carrington H.*, 483 S.W.3d at 522 ("'In light of the interests and consequences at stake, parents are constitutionally entitled to fundamentally fair procedures' in termination proceedings.") (quoting **Santosky**, 455 U.S. at 754); *see also **Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.***, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures)).[7]

Here, DCS failed to admit into evidence not only the original plan (created September 27, 2017), but the final plan (created February 27, 2019) as well.  The two permanency plans, which were admitted into evidence (created May 18, 2018 and September 20, 2018) were allegedly based on a December 20, 2017 plan, which is also missing from the record.[8]  While Ms. Delp, the Children's DCS caseworker, testified to some requirements of "the permanency plan," we have explained that this alone is insufficient, and that the permanency plans on which DCS relies must still be included in the evidence.  *See In re T.N.L.W.*, 2007 WL 906751, at *5; *In re A.J.R.* 2006 WL 3421284, at *5; *D.W.J.*, 2005 WL 1528367, at *3.  Without proof of Mother's responsibilities under the plans, the trial court could not make valid findings concerning whether Mother "put in real effort to complete the requirements of the plan[s] in a meaningful way in order to place herself in a position to take responsibility for the [C]hildren."  *In re C.S., Jr., et al.*, 2006 WL 2644371, at *10; *see also D.W.J.*, 2005 WL 1528367, at *3 ("Without [all of] the plan[s] in evidence, the trial judge could not have properly made the required factual determinations regarding the plan[s].")*; In re A.J.R.*, 2006 WL 3421284, at *4.  Moreover, because we are a reviewing court, "[w]ithout the plan[s] in evidence, we do not have an adequate record from which to review the trial court's decision."  *D.W.J.*, 2005 WL 1528367, at *3.  *See also In re A.J.R.* 2006 WL 3421284, at *4.  A "trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law," which this Court reviews de novo with no presumption of correctness.  *In re Carrington H.*, 483 S.W.3d at 534.  After an extensive review of the record, we conclude that there is insufficient evidence to support the trial court's findings that Mother was in substantial noncompliance with the permanency plans.  Because DCS failed to admit into

[7] It is unclear from the record whether Mother was afforded adequate due process concerning the final permanency plan, created February 27, 2019, because we are unable to determine if and when the trial court ratified the final plan.  The trial court ratified the September 20, 2018 plan on January 14, 2019, four months after the plan's creation.  If the trial court took a similar length of time to ratify the February 27, 2019 plan, the plan could have been ratified as late as June 2019, one month after DCS filed the petition to terminate Mother's parental rights.  It would be fundamentally unfair for DCS to file a petition to terminate Mother's parental rights based on her failure to act under a permanency plan *before* the trial court ratified the plan and *before* the date by which she was required to act.  Indeed, this is a practice we have previously concluded is unreasonable.  *See In re Nakayia S.*, No. M2017-01694-COA-R3-PT, 2018 WL 4462651, at *4 (Tenn. Ct. App. Sept. 18, 2018) ("[W]e find the requirements [of the permanency plan] were unreasonable because the juvenile court did not ratify the third permanency plan until two months after DCS filed its [p]etition to [t]erminate.").

[8] We note that the May 18, 2018 plan has "partial plan" written on every page.  Therefore, it appears our record contains only one complete plan out of the five DCS created for this case.

- 12 -

evidence three of the permanency plans on which it relied to terminate Mother's parental rights, we conclude it failed to carry its burden of proof as to this ground. *See **In re T.N.L.W.***, 2007 WL 906751, at *5; ***In re A.J.R.*** 2006 WL 3421284, at *4; ***D.W.J.***, 2005 WL 1528367, at *3. Accordingly, we reverse the trial court's finding that Mother was in substantial noncompliance with the permanency plans.

## 2. Mental Incompetence

The trial court also found, by clear and convincing evidence, that Mother does not possess the mental competence to properly care for the Children. Tennessee Code Annotated section 36-1-113(g)(8) provides:

> (8)(A) . . . [J]uvenile courts shall have jurisdiction . . . to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;

> (B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

> > (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and

> > (ii) That termination of parental or guardian rights is in the best interest of the child.

> (C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated;

Tenn. Code Ann. § 36-1-113(g)(8). "For this ground, it is insufficient to show only that a parent suffers from mental incompetence; rather, 'the real issue is whether this impairment adversely affects [the] ability to parent[.]'" ***In re Katrina S.***, No. E2019-02015-COA-R3-PT, 2020 WL 5269236, at *10 (Tenn. Ct. App. Sept. 3, 2020) (quoting ***In re C.C.***, No. E2016-00475-COA-R3-PT, 2016 WL 5266669, at *13 (Tenn. Ct. App. Sept. 22, 2016); *see also **In re Quadayvon H.***, No. E2016-00445-COA-R3-PT, 2016 WL 7340427, at *8 (Tenn. Ct. App. Sept. 30, 2016) ("The issue in this case is not whether Father has impaired

- 13 -

cognitive functioning. Rather, the issue is whether his impairment adversely affects his ability to parent his children.")).

In its order, the trial court found:

. . . [Mother] is incompetent to provide for the further care and supervision of the [C]hildren because her mental condition is impaired to a level that she is unlikely to be able to resume the care and responsibility for the [C]hildren in the near future. The [c]ourt further finds that [Mother]'s mental condition is unlikely to improve.

The [c]ourt concludes, based on expert testimony, that [Mother] is incompetent to provide adequately for the care and supervision of her children due to her mental condition. The [c]ourt further concludes that [Mother]'s condition is likely to remain impaired.

The [c]ourt finds that [Mother] cannot fulfill her role as a caregiver when she is not able to care for herself; [Mother] has a payee due to her incompetence. The [c]ourt is surprised that [Mother] is able to maintain custody of Alexi[a] in Colorado (Haley having reached the age of majority). The [c]ourt finds that the issues with [Mother] are more than issues with her IQ; [Mother]'s low intelligence coupled with her mood disorder create a situation where she is almost out of touch with reality.

In reaching this conclusion, the trial court relied on the testimony and report of DCS' expert witness, Dr. Brietstein, a clinical psychologist, who conducted Mother's psychological evaluation. Based on several diagnostic tests and a lengthy interview with Mother, Dr. Brietstein diagnosed her with a mild intellectual disability, borderline personality disorder, and intermittent explosive disorder. Concerning Mother's intellectual disability, Dr. Brietstein reported that Mother "functions within the extremely low range of intelligence, having obtained a full-scale IQ of 65." The tests revealed that Mother reads at a second-grade level and understands math at a first-grade level. Dr. Brietstein explained that Mother is considered "functionally illiterate and is incapable of performing simple math. . . ."[9]

It is unclear whether Mother recognizes the extent of her intellectual disability. Mother believes she receives social security disability because of a learning disability, not due to her intellectual disability. Further, despite the fact that Mother cannot add, subtract, or count money, she testified at trial that she is capable of managing her own finances, but

---

[9] Two of the tests administered to Mother required her to read questions from a computer prior to answering them. Due to Mother's illiteracy, she was unable to read the questions, and Dr. Brietstein had to read them to her.

that it is better for her to have a payee. Mother testified that she believes she is caring for Alexia "on [her] own" despite receiving services from multiple providers, which not only manage Mother's finances but also provide her with mental health treatment, transport her to appointments, and help with her paperwork.

The test results explained why Mother requires multiple service providers to care for herself and Alexia. According to Dr. Brietstein, Mother scored very poorly on "tasks that require the ability to understand language and those that require nonverbal reasoning." Therefore, Dr. Brietstein opined that Mother has a "significant cognitive deficiency that would seriously limit her ability to utilize judgment and make appropriate, independent decisions with regard to parenting and the safety of her children." The record reflects that Mother's intellectual disability has already limited her ability to appropriately and safely parent her older children. Colorado DHS records demonstrated that, when Alexia threatened suicide in Mother's presence, Mother's alarming response was to tell Alexia to kill herself.

Dr. Brietstein's tests also revealed that Mother has several mood disorders, although she denies any history of mental health problems. Mother has "prominent symptoms of depression, including a tendency to cry easily, a loss of self-esteem, a preoccupation with sad thoughts and feelings of pessimism or hopelessness about the future." Further, the tests indicated that Mother "minimized the extent of her anger and propensity toward aggression." The evidence in the record demonstrates that Mother has routinely minimized or failed to take responsibility for her anger towards, and abuse of, her older children. When Dr. Brietstein questioned Mother concerning her record with Colorado DHS, Mother stated that "[t]here was no evidence of anything." At trial, Mother testified that her history with Colorado DHS was a "one-time thing," that there had been "a lot of calls, but they've all been closed." However, Colorado DHS records provided that there were four "founded" cases of child abuse and 61 referrals concerning Mother and her oldest children. The records also demonstrated that Mother was arrested for physically abusing Alexia. Regarding this incident, Mother told Dr. Brietstein that she merely "popped" Alexia in the mouth, but admitted that it was hard enough to send the child to the hospital. When Dr. Brietstein questioned why Mother would strike her child, Mother stated, "I don't remember, I must of [sic] been angry." At trial, Mother testified that she struck Alexia because Alexia "jumped in her face and cussed at [her]." According to the same records, Mother threatened to shoot Alexia in the foot. There was also an alleged tape recording of Mother screaming and slapping Alexia repeatedly. When Dr. Brietstein confronted Mother with this information, Mother's response was that Colorado DHS could not produce the tape. Mother similarly declined to take responsibility for her failure to visit the Children in Tennessee. In her interview with Dr. Brietstein Mother blamed DCS for her failure to visit, even though DCS repeatedly asked her to visit and provided bus fare and lodging for the visits. At trial, Mother blamed Father, testifying that he threatened her whenever she asked to visit the Children.

Mother's behavior is indicative of a person with borderline personality disorder. Dr. Brietstein testified that he diagnosed Mother with borderline personality disorder because she "presents as someone who is manipulative," "she makes things up that suit her," and because she was angry, hostile, and argumentative during the evaluation. According to Dr. Brietstein, "the inability to control your emotions is the typical feature of borderline personality disorder." Dr. Brietstein cautioned that this disorder also places Mother at risk of entering into future abusive relationships, similar to her past romantic relationships. He testified that individuals with borderline personality disorder often "place themselves in situations in which they are taken advantage of and abused by those who are stronger than themselves, yet, [the victim is] attracted to [the abuser]."

This Court has declined to terminate parental rights under the mental incompetence ground where a parent has a mild intellectual disability, but may be able to "competently parent with intensive, long-term intervention." *In re Christopher S.*, No. E2012-02349-COA-R3-PT, 2013 WL 5436673, at *17 (Tenn. Ct. App., filed Sept. 27, 2013)). Contrastingly, we have concluded that termination is appropriate when expert testimony demonstrated that a parent's mental disability was a "lifelong condition," and that "no amount of training, education, or counseling 'could bring [the parent] up to the level where he could parent [the] children." *State, Dep't of Children's Servs. v. Mims*, 285 S.W.3d 435, 449 (Tenn. Ct. App. 2008). "When applying this ground, Tennessee courts have consistently held that "'[a] parent's continued incapacity to provide fundamental care for a child, whether caused by mental illness, mental impairment, or some other cause constitutes sufficient ground for termination of parental rights.'"" *In re Samuel R.*, No. W2017-01359-COA-R3-PT, 2018 WL 2203226, at *9 (Tenn. Ct. App. May 14, 2018), *appeal denied* (Aug. 13, 2018) (quoting *In re Eric G.*, No. E2017-00188-COA-R3-PT, 2017 WL 4844378, at *11 (Tenn. Ct. App. Oct. 25, 2017) (*no perm. app. filed*) (quoting *In re M.E.W.*, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *7 (Tenn. Ct. App. Apr. 21, 2004)).

Mother's intellectual disability alone may not rise to the level of mental incompetence so as to justify termination; however, Mother's intellectual disability, *in connection with* her borderline personality disorder, intermittent explosive disorder, and her denial of any mental health issues, prevent her from ever being able to adequately provide and care for the Children. Tenn. Code Ann. § 36-1-113(g)(8)(B)(i). In short, Mother's intellectual disability limits her ability to judge and make appropriate independent decisions, while her borderline personality disorder and intermittent explosive disorder leave her unable to control her emotions, causing her to be physically and emotionally abusive and to lie and manipulate others. According to Dr. Brietstein, Mother's borderline personality diagnosis does not have a positive prognosis. Individuals with this disorder typically do not respond well to therapy, but may respond to receiving some support, as Mother has. However, despite all the services Mother receives, according to Dr. Brietstein, she is "barely [able to] tread water." Even more concerning, despite Mother's participation in counseling, she denies she suffers from any mental health

disorder, and she refuses to accept responsibility for her anger and for her verbal, emotional, and physical abuse of her children. As is common in individuals with borderline personality disorder, Mother fabricates excuses to avoid assuming responsibility for her actions. Mother's intellectual disability and mood disorders have already adversely affected her ability to parent her older children and would certainly affect her ability to parent these Children as well. *See In re C.C.*, 2016 WL 5266669, at *13. Because "[t]he statute serves to protect children from harm caused by a parent who is incapable of safely caring for them," the question becomes "whether the child would be able to safely live with the parent[]." *In re Samuel R.*, 2018 WL 2203226, at *9 (internal citations omitted). We conclude that it would be detrimental to the safety and welfare of the Children to be placed with Mother. There is clear and convincing evidence that Mother's intellectual disability as well as her mood disorders impair her ability to safely care for and parent the Children. Further, we conclude that there is clear and convincing evidence that Mother will likely suffer from her disability and mood disorders for the rest of her life, preventing her from ever resuming care of the Children. Accordingly, we affirm the trial court's termination of Mother's parental rights as to the ground of mental incompetence.

### 3. Failure to Manifest an Ability and Willingness to Assume Custody[10]

Tennessee Code Annotated section 36-1-113(g)(14) provides a ground for termination of parental rights when

> [a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires DCS to establish two separate elements by clear and convincing evidence. *In re Maya R*., No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (citation omitted). First, DCS must prove that Mother "failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren].'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)).[11] Second, DCS must prove that placing the Children in

---

[10] Mother did not appeal the trial court's termination of her parental rights as to this ground. However, as discussed, *supra*, we must review the trial court's findings as to each ground for termination regardless of whether a parent challenged those findings on appeal. *See In re Carrington H.*,483 S.W.3d at 525-26.

[11] This Court is split over the proper interpretation of the first prong of Tennessee Code Annotated Section 36-1-113(g)(14). *See In re Ellie K*., No. M2019-01269-COA-R3-PT, 2020 WL 1943522, at *9-11. (Tenn. Ct. App. Apr. 23, 2020) (describing the Court's conflicting views on the first prong of the statute). The split concerns whether a parent must fail to manifest both an ability and willingness to assume custody or financial responsibility or whether a parent must fail to manifest either an ability or willingness to assume

Mother's legal and physical custody would "pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." *Id.*

In its order terminating her parental rights, the trial court found

. . . that there is clear and convincing evidence that [Mother] has failed to manifest an ability and willingness to assume legal and physical custody of the [C]hildren. The State of Colorado denied placement of the [C]hildren with [Mother]. Colorado [DHS] advised that they would not conduct another ICPC until [Mother] made progress on the permanency plan; she has not.

Further, placing the [C]hildren in the custody of [Mother] would pose a risk of substantial harm to the physical or psychological welfare of the [C]hildren. [Mother] does not have a relationship with the [C]hildren; the [C]hildren have not lived with their mother since 2011. According to Dr. Brietstein, [Mother] is not equipped to meet the needs of her children; she has a history of physical abuse against her children, neglect of her children, and domestic violence in her home.

The trial court's order regarding the first prong of this ground provides no specific factual findings and only generally states that Mother has not made progress on the permanency plans. As discussed, *supra*, there are issues in the record concerning the permanency plans and the trial court's findings regarding same. However, when considering the trial court's entire order, and upon review of the record, we conclude that DCS has met its burden as to this ground.

The record demonstrates that Mother's intellectual disability and mood disorders, discussed *supra*, prevent her from being able to adequately comprehend or retain information concerning the Children's mental health issues. Both Children suffer from significant trauma related to their unstable childhoods, and Dyllon has considerable behavioral problems as a result. During the pendency of this case, he spent several months at an in-patient treatment facility to address these issues. Dyllon requires a unique and intensive therapeutic parenting style to manage his trauma. At trial, Mother admitted she had not spoken with any of the Children's providers concerning their treatment plans or their need for discipline. Mother testified that she was unaware of the Children's current mental health treatments, what services each child receives, and what services the Children will require in the future. Rather than accept responsibility for her lack of knowledge, Mother blamed Ms. Delp and other DCS caseworkers, a characteristic of her borderline

---

custody or financial responsibility. *Compare* **In re Ayden S**., No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018) with **In re Amynn K**., No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018). By order of June 15, 2020, the Tennessee Supreme Court certified two questions for review on this issue of statutory interpretation involving the first prong of Tennessee Code Annotated section 36-1-113(g)(14). *See* **In re Nevaeh M.**, M2019-00313-SC-R11-PT.

personality disorder, testifying that Ms. Delp and DCS "don't really let [her] know" about the Children but that she has asked. However, upon further questioning, it was revealed that the Children's mental health issues and respective treatment plans were discussed during team meetings, of which Mother had been a part. Only then did Mother acknowledge that she was likely in the meetings and failed to recall the discussion. By her own testimony, Mother is unable to retain important information related to the Children's mental health treatment so as to implement it. This is substantiated by Dr. Brietstein's evaluation of Mother, specifically that "her delayed memory was poor as she failed to remember any of 3 words after a brief delay." Mother's poor memory directly affects her ability to care for the Children.

Similarly, Mother's intellectual disability prevents her from considering and implementing appropriate parenting decisions. As discussed, *supra*, Dr. Brietstein observed that Mother has "a significant cognitive deficiency," which "seriously limit[s] her ability to utilize judgment and make appropriate, independent decisions with regard to parenting and the safety of her children." The record reflects that Mother has already shown extremely poor parenting judgment as demonstrated by her alarming response to Alexia's suicide threat, discussed *supra*. Mother's behavior during one visit with the Children also demonstrated Mother's poor parental judgment. Ms. Gilbert, the supervisor who oversaw therapeutic visitation between Mother and the Children, and Ms. Delp both testified concerning Mother's visit with the Children where Mother failed to adequately supervise the Children at a mall playground. Ms. Delp testified that she and Ms. Gilbert were forced to intervene several times because the Children were running around and knocking down smaller children in the playground. According to Ms. Delp, Mother complained that Ms. Delp and Ms. Gilbert were "not allowing [the Children] to have any fun." Mother's poor judgment was further exemplified during this visit when she refused to provide the Children with an adequate meal, despite the visit lasting through dinner time.

The record clearly demonstrates that Mother's intellectual incapacity also prevents her from manifesting an ability to assume financial responsibility for the Children. *See* Tenn. Code Ann. § 36-1-113(g)(14). According to the record, Mother cannot provide for herself financially as she requires government benefits and assistance from her Colorado providers to maintain a stable lifestyle. As discussed, *supra*, because Mother cannot count money, she requires a payee to manage her finances, and she acknowledges that she needs one. We fail to see how Mother could assume financial responsibility for two children when she is unable to assume financial responsibility for herself.

Even allowing for Mother's intellectual disability and mental disorders, Mother's behavior throughout the proceeding and during her visits demonstrates that, while Mother is unable to care for the Children, she is also unwilling. Colorado DHS denied the ICPC placement of the Children with Mother, in part because she lived in a two-bedroom apartment with two other children. Colorado DHS was concerned that Mother's apartment could not reasonably accommodate two more children. Despite being aware that this was

- 19 -

a partial reason for denial of placement, Mother moved to another two-bedroom apartment. Mother clearly has the ability to secure housing. However, she has chosen not to obtain appropriate housing for additional children.

Similarly, Mother has demonstrated a general unwillingness to develop a genuine bond with the Children. Despite DCS providing Mother with bus fare and lodging whenever she desired to visit the Children, Mother only traveled to Tennessee twice during the three years this matter was pending. Further, during the visits, Mother showed a general unwillingness to engage with both Children. Ms. Gilbert testified that, in 2018, during Mother's first visit with the Children in over seven years, Mother played on her cell phone the majority of the time and left after 45 minutes. According to Ms. Gilbert, on subsequent visits, Mother interacted with Aaliya but ignored and failed to engage with Dyllon. Ms. Gilbert testified that she never saw Mother interact with Dyllon in a "loving, positive way." In Mother's visit with the Children at a mall, discussed *supra*, Mother refused to play with the Children in the play area, instead telling Ms. Gilbert she wanted to walk around the mall to shop for herself. At a subsequent visit to a park, Mother brought toys for the Children to play with, but she refused to play with the toys and interact with the Children. Even with Mother's diminished mental capacity and mental disorders, she could have engaged the Children in activities, but she chose not to. Mother's actions have not demonstrated that she is willing to assume custody of the Children. *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018) ("When evaluating willingness, we look for more than mere words.") (citing *In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018) ("Although Mother testified that she was both willing and able, her actions proved otherwise."); *In re Amynn K.*, 2018 WL 3058280, at *15 ("We recognize that Father has repeatedly verbalized his willingness to assume custody of the Child. However, Father's actions, including his continued criminal activity and his failure to financially support the Child, raise doubt as to Father's actual willingness to assume custody or financial responsibility for the Child.")).

Finally, as discussed, *supra*, the record clearly shows that Mother has trouble addressing her own mental health issues, even denying that she suffers from mental health disorders. Placing the Children, who have significant mental health concerns of their own, in Mother's care would be a serious detriment to the Children and pose a risk of substantial harm to both their physical and psychological welfare. Accordingly, we conclude there is clear and convincing evidence to affirm the trial court's termination of Mother's parental rights on the ground of failure to manifest an ability and willingness to assume custody of the Children.

## C. Best Interest

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the

parent's rights is in the child's best interest.  ***In re Bernard T.***, 319 S.W.3d at 606 (citing ***In re Adoption of A.M.H.***, 215 S.W.3d at 809).

As the Tennessee Supreme Court explained:

> Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." ***In re Kaliyah S.***, [455 S.W.3d 533, 555 (Tenn. 2015)] (citing ***In re Audrey S.***, [182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)]).  "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." ***Id.*** When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." ***In re Audrey S.***, 182 S.W.3d at 878.  Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors.  ***Id.***  "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d)(2017).

***In re Gabriella D.***, 531 S.W.3d 662, 681-82 (Tenn. 2017).

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case.  As is relevant to this appeal, these factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

\*\*\*

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child . . . .

Tenn. Code Ann. § 36-1-113(i). This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." ***In re M.A.R.***, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005), *perm. app. denied* (Tenn. Nov. 21, 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. ***In re Audrey S***., 182 S.W.3d at 877. As explained by this Court:

Ascertaining a child's best interests . . . does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

***White v. Moody***, 171 S.W.3d 187, 194 (Tenn. Ct. App. 1994).

In its order terminating Mother's parental rights, the trial court enumerated findings that supported the majority of the best interest factors. Concerning factors one and two, the trial court found that

[Mother] has failed to make an adjustment in her circumstances that would make it safe for the [C]hildren to go to her home. Perhaps, [Mother] is unable to change her circumstances due to her disability, but it is clear, it is not in the [C]hildren's best interest to reside with her. DCS and the service providers have assisted [Mother] to address the issues that lead to the removal of the [C]hildren, or prevented their placement with her, but [Mother] has not made efforts of her own to remedy the conditions that prevent placement with her . . . .

We agree. As discussed, *supra*, Mother failed to obtain suitable housing for herself, Alexia and the Children. Further, despite the social services Mother receives, she is still barely able to function and care for herself and Alexia, let alone two more children. Additionally, Mother's diagnoses of an intellectual disability and mood disorders will be lifelong struggles for her that cannot be overcome with social services.

> Concerning factors three and four, the trial court found that
>
> [t]he [C]hildren have been in the custody of DCS for twenty months, [Mother] had not seen the [C]hildren at all between 2011 and 2018. [Mother] does not have a relationship with these [C]hildren. The [C]hildren are placed together in a home with their half siblings. Although the [c]ourt does not find the ground of abandonment for failure to visit, the [c]ourt does find that [Mother]'s limited visitation with the [C]hildren has resulted in a situation where she does not know the needs of her [C]hildren and her [C]hildren lack a bond with her.

The record supports these findings. Mother admitted that she had not visited the Children from 2011 to 2018. Even after DCS obtained custody over the Children, Mother only traveled to Tennessee twice in three years to visit. Ms. McGill, the therapist providing Comprehensive Child and Family Treatment for the Children in the foster home, testified that the Children do not have an attachment to Mother. This is unsurprising as the Children left her care when they were only one-and-a-half and two-and-a-half years old, and have only interacted with Mother a handful of times since. Ms. McGill testified that the Children have an attachment to "the idea of [a] [m]other, but not necessarily a true, genuine, authentic love or attachment to the . . . specific person." This is substantiated by Ms. Delp's testimony that after visits with Mother, the Children never seemed upset that she was leaving. According to Ms. Delp, "[i]t was just, 'Bye; see you tomorrow.' There [were] no tears . . . not what you would expect from a normal goodbye after a family visit." In her testimony, Mother agreed that it was difficult to build a bond with the Children when she had only seen them a few times in the past several years.

> Regarding factor five, the trial court found that
>
> [t]he foster parents have provided a safe and stable home for the [C]hildren and they are doing well in their placement. Although the foster parents have not fully decided on whether they are willing to adopt, the [c]ourt finds that removal of the [C]hildren from that home would be detrimental to them psychologically and medically.

We agree, and there is overwhelming evidence in the record to support this factor. Ms. McGill testified that both Children suffer from attachment-related trauma as well as trauma related to early childhood maltreatment. She explained that the Children "need stability, a

- 23 -

sense of safety and consistency in their lives in order to heal," and that they are receiving that stability and support in their foster home. Regarding their current foster home placement, Ms. McGill testified that the foster parents "are very open and receptive to the type of work needed to help heal that attachment-related trauma, to give [the Children] a corrective experience so that they can, essentially, rewire and learn skills to feel safe within a parent/child relationship." According to Ms. McGill, the Children have a genuine attachment with their foster mother and reach out to her to have their emotional needs met. Importantly, Ms. McGill cautioned that "a disruption [in the Children's placement] could also disrupt their treatment process and the attachments that they're forming now." To remove these Children from the only stable home they have ever known would likely cause them severe emotional and physical distress.

As to the remaining factors, the trial court found that

[Mother] does not have a safe home due to her unstable mental health. The State of Colorado has not approved placement of the [C]hildren with [Mother] and [Mother] has not made efforts to change that assessment.

As discussed at length, *supra*, Mother's intellectual disability and her mood disorders prevent her from being able to provide the Children with a safe and stable environment. Placing the Children in Mother's care would almost certainly have a detrimental effect on the Children's physical, emotional, and psychological wellbeing. For these reasons, we conclude there is clear and convincing evidence that termination of Mother's parental rights is in the Children's best interests.

## V. Conclusion

For the foregoing reasons, we reverse the trial court's termination of Appellant's parental rights on the ground of substantial noncompliance with the permanency plan. We affirm the trial court's denial of Appellant's motion for continuance, its termination of Appellant's parental rights on all other grounds, and on its finding that termination of Appellant's parental rights is in the Children's best interests. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, Cherish M. Because Cherish M. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE